James Donald JUELICH, Plaintiff,

v.

YAMAZAKI MAZAK OPTONICS CORPORATION, a/k/a Yamazaki Mazak Minokamo Corporation, defendant, Appellant,

Mazak Nissho Iwai Corporation, defendant, Appellant,

Gladwin Machinery & Supply Co., Defendant,

Meikikou Corporation, defendant, Respondent,

and

Meikikou Corporation, Third Party Plaintiff, Respondent,

v.

Aries Precision Sheet Metal Company, Third Party Defendant.

Nos. A03–174, A03–228.

Supreme Court of Minnesota.

June 24, 2004.

Cory Patrick Whalen, Wilbur W. Fluegel, Fluegel Law Office, Minneapolis, MN, for Appellant Juelich.

Blake William Duerre, Anton Johan Van Der Merwe, Arthur Chapman Kettering, Minneapolis, MN, for Respondent Yamazaki Mazak Optonics Corporation.

Carl Paul Carver, Kevin Patrick Curry, Minneapolis, MN, for Respondent Mazak Nissho Iwai Corporation.

Robert D. Brownson, Kristi Kay Warner, Brownson & Ballou, Minneapolis, MN, for Respondent Meikkou Corporation.

## OPINION

HANSON, Justice.

The issue presented in this case is similar to the one stated by the United States Supreme Court in its 1987 decision of *As-*

*ahi Metal Industry Co. v. Superior Court of California* as follows:

> [W]hether the mere awareness on the part of a foreign defendant that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes "minimum contacts" between the defendant and the forum State such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"

480 U.S. 102, 105, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion) (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). In *Asahi,* the Court answered this question against jurisdiction. *Id.* at 116, 107 S.Ct. 1026. Likewise, the court of appeals concluded that Minnesota's exercise of personal jurisdiction over respondent Meikikou Corporation (Meikikou) would violate the guarantee of due process provided by the United States Constitution. *Juelich v. Yamazaki Mazak Optonics Corp.,* 670 N.W.2d 11, 19 (Minn.App.2003). We affirm the decision of the court of appeals, though on slightly different grounds.

Plaintiff James Donald Juelich was injured while providing maintenance to a scissor-lift table manufactured by Meikikou. He brought a personal injury/products liability action against Meikikou and appellants Yamazaki Mazak Optonics Corporation (YMO) (who manufactured the laser-cutting machine that included the table as a component part) and Mazak Nissho Iwai Corporation (MANI) (the international distributor for YMO of the laser-cutting machines).

Meikikou is a Japanese corporation who manufactured the scissor-lift table at its factory in Japan. Meikikou sold the table to Ishihara Shoji, Meikikou's Japanese distributor, in Japan. On instruction from Shoji, Meikikou delivered the table to Seiko Keisakusho in Japan, who delivered it to YMO in Japan. YMO used the table as a part of a laser-cutting machine, known as a "Super Turbo X510 System," that it manufactured in Japan. YMO then sold the system to YMO's Illinois subsidiary corporation, MANI, which was YMO's international distributor. MANI sold the system to Gladwin Machinery & Supply Company, a Minnesota supplier, and Gladwin sold the system to Aries Precision Sheet Metal Company, the Minnesota company that was Juelich's employer. MANI's service technician installed the equipment at Aries and trained Juelich and another employee in its operation.

MANI produced evidence that 122 YMO systems with Meikikou tables had been delivered in the United States, including 17 of them in Minnesota. There also was evidence that Meikikou knew that YMO intended to market the laser systems in the United States. On July 3, 2000, Meikikou employees met in Japan with representatives of YMO and Shoji to discuss YMO's sales of the laser systems in the United States. At the request of YMO, Meikikou provided English warning labels to be placed on the tables by YMO once the tables were installed in the YMO laser-cutting machine. Meikikou also provided YMO an operations manual in Japanese that was to be used by YMO in preparing an English manual for the system. Meikikou was not involved in preparing the English manual.

There was also evidence that Meikikou maintains an English language website that features Meikikou as a world player in the scissor-lift table field. The website identifies Meikikou's domestic and international "associated" companies, including four in the United States. The website

focuses primarily on a description of Meikikou as a corporation and only slightly on a description of its products. It does not contain any mechanism for ordering products. Meikikou does not otherwise direct any advertising to Minnesota businesses. Meikikou is a member of two international business groups, is ISO[1] certified, and maintains worldwide insurance coverage.

Meikikou answered Juelich's complaint and raised lack of personal jurisdiction as an affirmative defense. Meikikou then served a cross-claim against Gladwin and a third-party claim against Aries. Both YMO and MANI asserted cross-claims against Meikikou.

Meikikou moved to dismiss Juelich's complaint and YMO and MANI's cross-claims for lack of personal jurisdiction. That motion was based on the unsworn affidavit of Tsutomu Odaguchi, Meikikou's Managing Director and General Manager of Development. The district court first ordered Meikikou to answer interrogatories and to produce Odaguchi for his deposition. After the deposition, Meikikou provided excerpts of Odaguchi's testimony to the court. Odaguchi testified that Meikikou has no involvement with the scissor-lift tables once they are delivered to Seiko in Japan; that Meikikou does not sell scissor-lift tables to United States customers directly; that Meikikou sells its products only to Japanese companies, some of which incorporate components obtained from Meikikou into their own products and then sell them overseas; that Meikikou pro-

duces English warning labels for its Japanese customers but only Japanese language operations manuals; and that, whenever YMO alerted Meikikou that it intended to sell the finished product in another country, Meikikou would follow YMO's instructions to install safety valves or comply with other specifications particular to that country.

After receiving excerpts from Odaguchi's deposition, the district court granted Meikikou's motion to dismiss.[2] Juelich filed a notice of appeal and YMO and MANI filed joint appeals. The court of appeals affirmed the district court. The court of appeals concluded that *Asahi* "clarified the stream-of-commerce theory," quoting from Justice O'Connor's plurality opinion that the "placement of a product into a stream of commerce, without more, is not an act of the defendant purposely directed toward the forum State." *Juelich*, 670 N.W.2d at 18 (quoting *Asahi*, 480 U.S. at 112, 107 S.Ct. 1026.). YMO and MANI petitioned this court for further review. Juelich settled all of his claims with YMO and MANI and did not seek further review. Thus, the only claims against Meikikou that remain in this action are the cross-claims of YMO and MANI.

## I.

▉ Whether personal jurisdiction exists is a question of law which we review de novo. *V.H. v. Estate of Birnbaum*, 543 N.W.2d 649, 653 (Minn.1996). Once jurisdiction has been challenged by the defen-

---

1. "ISO" refers to the International Standards Organization, the organization that certifies a company's quality and environmental standards.

2. YMO/MANI argue that the district court should not have relied on the testimony of Tsutomu Odaguchi because his affidavit was unsworn and his deposition testimony was discredited. This issue of evidentiary sufficiency was not raised in the petition for re-

view and therefore is not properly before this court. *Anderly v. City of Minneapolis*, 552 N.W.2d 236, 239–40 (Minn.1996); *Northwest Racquet Swim and Health Clubs, Inc. v. Deloitte & Touche*, 535 N.W.2d 612, 613 n. 1 (Minn.1995). In any event, the district court's order was based on many different parts of the record, not just the testimony of Odaguchi.

dant, the burden is on the plaintiff to prove that sufficient contacts exist with the forum state. *Dent–Air, Inc. v. Beech Mountain Air Service, Inc.*, 332 N.W.2d 904, 907 n. 1 (Minn.1983). At the pretrial stage, however, the plaintiff's allegations and supporting evidence are to be taken as true. *Id.* (citing *Hardrives, Inc. v. City of LaCrosse, Wisconsin*, 307 Minn. 290, 293, 240 N.W.2d 814, 816 (1976)).

■ Minnesota's long-arm statute, Minn.Stat. § 543.19 (2002), permits Minnesota courts to assert personal jurisdiction over defendants to the full extent of federal due process. *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410 (Minn. 1992). Due process requires that the defendant have "certain minimum contacts" with the forum state [3] and that the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." *Burnham v. Superior Court of Cal.*, 495 U.S. 604, 618, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) (quoting *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154).

*Minnesota's Five–Factor Test*

■ In Minnesota, a five-factor test has been used to determine whether the exercise of personal jurisdiction over a foreign defendant is consistent with due process. *Hardrives, Inc.*, 307 Minn. at 294, 240 N.W.2d at 817 (citing *Aftanase v. Economy Baler Co.*, 343 F.2d 187, 197 (8th Cir. 1965)). This test requires the court to evaluate:

(1) the quantity of contacts with the forum state;

(2) the nature and quality of those contacts;

(3) the connection of the cause of action with these contacts;

(4) the interest of the state providing a forum; and

(5) the convenience of the parties.

*Id.*

The first three factors determine whether minimum contacts exist and the last two factors determine whether the exercise of jurisdiction is reasonable according to traditional notions of fair play and substantial justice. Although distinct, there is an interplay between the minimum contacts factors and the reasonableness factors because they all trace their origin to the holding of *International Shoe*, that a court cannot subject a person to its authority where maintenance of the suit would offend "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. 154. The First Circuit Court of Appeals has described this interplay as follows:

We think * * * the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on [minimum contacts], the less

---

**3.** The nature and quality of the requisite contacts varies depending on whether the type of jurisdiction being asserted is general or specific. General personal jurisdiction exists when a nonresident defendant's contacts with the forum state are so substantial and are of such a nature (continuous and systematic) that the state may assert jurisdiction over the defendant even for causes of action unrelated to the defendant's contacts with the forum state. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific personal jurisdiction exists when the defendant's contacts with the forum state are limited, yet connected with the plaintiff's claim such that the claim arises out of or relates to the defendant's contacts with the forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales*, 466 U.S. at 414, 104 S.Ct. 1868; *Griffis v. Luban*, 646 N.W.2d 527, 532 (Minn.2002). In this case, YMO/MANI are asserting that Minnesota has specific personal jurisdiction over Meikikou.

a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts].

*Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 210 (1st Cir.1994); *accord Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. 2174.

*The Stream–of–Commerce Theory of Minimum Contacts*

This court has recognized that minimum contacts may be indirect, under the stream-of-commerce theory. In *Rostad v. On–Deck, Inc.,* 372 N.W.2d 717 (Minn. 1985), we considered the personal jurisdiction over a New Jersey manufacturer of a product that caused injury to a Minnesota resident. Although the manufacturer had no office in Minnesota, owned no property here, had no agent to represent it here and was not licensed to do business here, we held that the manufacturer was subject to jurisdiction in Minnesota because the manufacturer placed its products in "the stream of commerce" through its contacts with distributors who sold the products throughout the United States and within Minnesota. *Id.* at 722. We determined that the manufacturer's contacts, though indirect, were sufficient and purposeful, stating: "[The manufacturer's] distribution contacts and marketing efforts were calculated attempts to create a national market for [its] product, a market which specifically includes Minnesota." *Id.*

The decision in *Rostad* relied upon the "stream-of-commerce theory" enunciated by the United States Supreme Court in *World–Wide Volkswagen Corp. v. Woodson,* where the Court stated:

> When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

444 U.S. 286, 297–98, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (citation omitted).[4]

Two years after our decision in *Rostad,* the United States Supreme Court decided *Asahi.* The facts of *Asahi* are strikingly similar to those of this case. *Asahi* involved an indemnification action brought in California by Cheng Shin, a Taiwanese tire manufacturer, against Asahi, the Japanese

---

4. While the example used by the Court dealt with jurisdiction over manufacturers and national distributors, the only parties contesting jurisdiction in *World–Wide Volkswagen* were the retail dealer and regional distributor. Thus the discussion of the "stream-of-commerce theory" is actually dicta. *See Nelson v. Park Indus., Inc.,* 717 F.2d 1120, 1124–25 (7th Cir.1983); *Ruckstuhl v. Owens Corning Fiberglas Corp.,* 731 So.2d 881, 887 (La.1999); Howard B. Stravitz, *Sayonara to Minimum Contacts: Asahi Metal Industry Co. v. Superior Court,* 39 S.C. L.Rev. 729, 761, 786, 788 (1988).

tire-valve manufacturer that had sold an allegedly defective component part to Cheng Shin. *Asahi*, 480 U.S. at 106, 107 S.Ct. 1026. The Court unanimously held that the exercise of jurisdiction over Asahi "would offend traditional notions of fair play and substantial justice" given the burden on the Japanese defendant and the minimal interest of California in the indemnification dispute. *Id.*

The *Asahi* Court split four-to-four on the initial question whether introducing products into the "stream of commerce" satisfies the due process requirement of minimum contacts in a product liability case.[5] Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, set forth the most restrictive test of whether a nonresident party has sufficient contacts with a forum to justify the assertion of personal jurisdiction. Justice O'Connor concluded that "[t]he placement of a product into the stream of commerce, *without more*, is not an act of the defendant purposefully directed toward the forum State," even if the defendant is aware "that the stream of commerce may or will sweep the product into the forum State." *Id.* at 112, 107 S.Ct. 1026 (emphasis added). Justice O'Connor offered the following examples of additional conduct that would show purposeful direction: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.*

Justice Brennan, joined by Justices White, Marshall and Blackmun, rejected the "something more" test and concluded that due process is afforded as long as the defendant knew its product was being marketed in the forum state. *Id.* at 116–17, 107 S.Ct. 1026 (Brennan, J., concurring in part and in judgment). Justice Brennan's approach was largely a rearticulation of the dicta in *World–Wide Volkswagen*, which stated that when a manufacturer or distributor attempts to serve a market "directly or indirectly * * *, it is not unreasonable to subject it to suit in [that market] if its allegedly defective merchandise has there been the source of injury to its owner or to others." 444 U.S. at 297, 100 S.Ct. 559.

Because the *Asahi* Court failed to reach a majority on the proper test to apply when determining minimum contacts, it was error for the court of appeals to rely on Justice O'Connor's "something more" approach in this case.[6] We conclude that the first three factors of our five-factor test (which trace their roots to the landmark decision of *International Shoe* and its progeny) continue to provide the proper framework for determining whether a foreign defendant has sufficient minimum contacts with Minnesota to support an exercise of personal jurisdiction.

*Traditional Notions of Fair Play and Substantial Justice*

While the *Asahi* Court was split with respect to the proper test for determining minimum contacts, a majority of the Court

---

**5.** Justice Stevens, joined by Justices White and Blackmun, concluded that, given the Court's holding that California's exercise of jurisdiction over Asahi would be "unreasonable and unfair," it was inappropriate for the Court to attempt to articulate the appropriate test for determining minimum contacts. *Asahi*, 480 U.S. at 121–22, 107 S.Ct. 1026 (Stevens, J., concurring in part and in judgment).

**6.** Far from clarifying the stream-of-commerce theory, the *Asahi* decision has led to different stream-of-commerce analyses being applied to similar sets of facts. *See* Kristin R. Baker, *Product Liability Suit and the Stream of Commerce After Asahi: World–Wide Volkswagen is Still the Answer*, 35 Tulsa L.J. 705, 706 (2000).

held that "[t]he strictures of the Due Process Clause forbid a state court to exercise personal jurisdiction over Asahi under circumstances that would offend 'traditional notions of fair play and substantial justice.'" *Id.* at 113 (citing *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154 quoting *Milliken v. Meyer*, 311 U.S. at 463, 61 S.Ct. 339); *see id.* at 116, 107 S.Ct. 1026 (Brennan, J., joined by White, Marshall, Blackmun, JJ., concurring in part and concurring in the judgment); *id.* at 121, 107 S.Ct. 1026 (Stevens, J., joined by White and Blackmun, JJ., concurring in part and concurring in the judgment). The majority concluded that, after weighing the factors set forth in *World–Wide Volkswagen Corp.*, the exercise of jurisdiction against *Asahi* would be "unreasonable and unfair." (Opinion of Justice O'Connor, 480 U.S. at 116.)

The factors weighed by the Court, beyond the minimum contacts, were "the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief." 480 U.S. at 113, 107 S.Ct. 1026. These are consistent with factors four and five of our five-factor test. Thus, our five-factor test continues to provide the appropriate analytical framework for determining whether the assertion of personal jurisdiction is consistent with due process.

## II.

To determine whether Meikikou is subject to personal jurisdiction in Minnesota, we will apply the five-factor test.

### (1) The quantity of contacts with the forum state

Although all of Meikikou's activities took place in Japan, YMO/MANI argue that the existence of 17 Meikikou lift tables in Minnesota and 122 in the United States, together with evidence of Meikikou's knowledge that YMO planned to market the laser system in the U.S., is sufficient to provide the minimum contacts necessary to confer personal jurisdiction on a Minnesota court.

■ YMO/MANI rely heavily on this court's decision in *Rostad*, 372 N.W.2d at 722, but *Rostad* is distinguishable. Unlike the manufacturer in *Rostad*, Meikikou is a foreign national corporation, it only manufactured a component part of a product that reached Minnesota, and it did not conduct any distribution or marketing efforts in the United States. Meikikou did not advertise its product in the United States or Minnesota, and the distribution and marketing efforts that were undertaken by YMO, MANI and Gladwin in Minnesota were not undertaken on behalf of Meikikou. MANI acted as a distributor for YMO, not for Meikikou. It was Ishihara Shoji who acted as Meikikou's distributor and it acted only in Japan.

YMO/MANI suggest that the stream-of-commerce theory should be applied because of the relationship between Meikikou and YMO and the economic gain that Meikikou realized through sales in the United States and in Minnesota. Although Meikikou realized economic gain from the seventeen tables it sold to YMO that ended up in Minnesota, its relationship with YMO was confined to Japan and its relationship with the United States seller, MANI, was remote. MANI has no contractual relationship with Meikikou. Although Meikikou was informed of YMO's plans to sell in the United States, there is no evidence that Meikikou participated in or knew the details of YMO's distribution or marketing plans, that Meikikou knew that MANI's sales would include Minnesota or that MANI was such a large distributor that one would necessarily conclude that its sales would be made in Minnesota.

In quantity, Meikikou's contacts with Minnesota were far less than those present

in *Rostad* and even less than those present in *Asahi.* Thus, the quantity of contacts factor does not weigh significantly in favor of jurisdiction.

### (2) The nature and quality of Meikikou's contacts

 In assessing the quality of contacts, this court looks to whether the party purposefully availed itself of the benefits and protections of Minnesota. *Dent–Air, Inc.,* 332 N.W.2d at 907. YMO/MANI argue that Meikikou, in conjunction with YMO, chose to penetrate the United States market. YMO/MANI point to a single meeting in Japan in July 2000 where representatives from YMO and Meikikou met to discuss Meikikou's manufacturing of the scissor-lift tables for incorporation in the Super Turbo X–510 systems. At this meeting, Meikikou was informed that the systems were destined for the United States and, therefore, English warning labels should be attached to the tables. Meikikou also purchased an insurance policy that covers claims made worldwide, including those made in Minnesota. The English labels and the insurance policy were not, however, particularly directed to Minnesota. The labels were useful in many countries and all other states of the United States and the insurance was useful worldwide.

 YMO/MANI assert that Meikikou's maintenance of a website, accessible by anyone in the world with access to an internet connection, demonstrates Meikikou's intent to purposefully avail itself of the Minnesota market. Courts that have considered this issue have examined "the nature and quality of the commercial activity conducted on the Internet" to determine whether the defendant purposefully availed itself of the laws of the forum state. *See, e.g., Multi–Tech Sys., Inc. v. VocalTec Communications, Inc.,* 122 F.Supp.2d 1046, 1050 (D.Minn.2000) (quoting *Mink v. AAAA Dev. LLC,* 190 F.3d 333, 336 (5th Cir.1999)). Because Meikikou's website merely provides general corporate information and does not include an order-taking function, it is properly categorized as a "passive" website. *Id.* Maintenance of a passive website generally does not support the exercise of jurisdiction. *Id.*

Meikikou manufactured only a component part, did not create, control or even influence the distribution by YMO of the finished product, and took no initiative in developing a United States market. Although Meikikou took certain actions to enable YMO to market its product in the United States, its actions fall short of the affirmative efforts to serve, directly or indirectly, the market for its product in the United States, as required by *World–Wide Volkswagen. See, e.g., Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 947 (4th Cir.1994) (holding that knowledge that an object would be sold in the forum was insufficient to confer personal jurisdiction without showing that the defendant directed some activity towards the forum); *Falkirk Mining Co. v. Japan Steel Works, Ltd.,* 906 F.2d 369, 375–76 (8th Cir.1990) (holding that purchasers bringing product into forum when manufacturer did not control distribution system and did not advertise or solicit business was insufficient to confer jurisdiction.).[7] Thus, the quality of Meikikou's contacts with Minnesota does not weigh strongly in favor of jurisdiction.

---

7. *See also Kernan v. Kurz–Hastings, Inc.,* 175 F.3d 236, 243 (2d Cir.1999) (exclusive sale rights agreement to sell products in North America evidenced effort to exploit American market, including New York); *Pennzoil Products Co. v. Colelli & Assoc., Inc.,* 149 F.3d 197, 207 (3d Cir.1998) (awareness that customers were selling product to third parties and expressed desire to maintain relationship with one such third party sufficient); *Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1360–61 (7th Cir.1996) (sam-

*(3) The connection of the cause of action with these contacts*

Even if one were to conclude that Meikikou did have material contacts with Minnesota under the stream-of-commerce theory, those contacts do not demonstrate that Meikikou purposefully availed itself of the protection of Minnesota law. *Dent–Air, Inc.*, 332 N.W.2d at 907. The sale of the Super Turbo X510 system to Aries, Juelich's employer, arose from the unilateral actions of several intervening suppliers, namely Shoji, YMO, MANI and Gladwin. Meikikou had contractual relations only with Shoji and YMO, and those were only in Japan and were several steps removed from any sale or delivery in the U.S. "[T]he mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.' " *World–Wide Volkswagen*, 444 U.S. at 298, 100 S.Ct. 559 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Thus, the connection of Juelich's claim to Meikikou's contacts with Minnesota does not materially favor the exercise of jurisdiction.

*(4) The interest of the state providing a forum*

YMO/MANI contend that Minnesota has an interest in providing a forum because plaintiff Juelich was a Minnesota resident at the time of the accident, his employer and Aries was a Minnesota corporation and Aries' workers' compensation insurer paid benefits to Juelich. But Juelich is not a party to this appeal and whatever subrogation interest Aries or its insurer may have had in Juelich's claim is not before this court. Thus, the current situation is virtually identical to that in *Asahi* because the dispute between Meikikou and YMO/MANI "is primarily about indemnification rather than about safety standards." *Asahi*, 480 U.S. at 114–15, 107 S.Ct. 1026. And like *Asahi*, it is "not at all clear at this point" that Minnesota law should govern the question of whether a Japanese corporation should indemnify another Japanese corporation on the basis of a sale and shipment made in Japan. *See id.* at 115, 107 S.Ct. 1026.

Even if Juelich were still a party to this case, the state's interest in providing him a forum to seek compensation from Meikikou would be lessened by the fact that Meikikou only supplied a component part and Juelich could pursue his claim against the manufacturer and distributor of the finished product. Because Minnesota no longer has an interest in the resolution of this dispute, this factor does not favor the exercise of jurisdiction.[8]

*(5) The convenience of the parties*

Regardless of the forum ultimately selected, some witnesses will be re-

---

ple sent to forum, knowledge of shipment to forum, storage in warehouse in forum, and shipment of replacement part to forum sufficient contacts); *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 573 (2d Cir. 1996) (sales of $4 million, relationship with dealers in forum, advertising in forum, visits to forum by personnel, and targeting of firms in forum sufficient); *Renner v. Lanard Toys Ltd.*, 33 F.3d 277, 283 (3d Cir.1994) (awareness of sale of product without regularity of shipments into forum insufficient); *Barone*, 25 F.3d at 615 (use of regional distributors belies claim that defendant did not know that

product was being sold in forum when it knew of sales in bordering states); *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1549 (11th Cir.1993) (nationwide distribution system of car designed for American market and national advertising sufficient); *Mason v. F. LLI Luigi and Franco Dal Maschio Fu G.B.*, 832 F.2d 383, 386 (7th Cir.1987) (minimum contacts when defendant custom made machine for company in forum state).

8. The notion of international comity is also an important aspect of this case, just as it was in *Asahi*. In *Asahi*, the Court cautioned that the

quired to travel to a foreign country. Therefore, convenience of the parties and witnesses is a neutral factor in the analysis. Given that the transaction on which the indemnification claim is based took place in Japan and Meikikou delivered the lift table in Japan, YMO/MANI have "not demonstrated that it is more convenient to litigate its indemnification claim" in Minnesota rather than in Japan. *See Asahi,* 480 U.S. at 114, 107 S.Ct. 1026. YMO/MANI claim that they "have expended substantial time and resources seeking a resolution through the Minnesota courts." But YMO/MANI were on notice from the outset that Meikikou challenged personal jurisdiction. If Minnesota has any residual interest in this action because it has invested court time in bringing the case to this point, that interest is outweighed by the demands that the parties would place on Minnesota to resolve their remaining indemnity issues.

When considering factors 4 and 5 together, we are left with the same conclusion as the one reached by the majority in *Asahi*—exercise of jurisdiction over Meikikou, a foreign national defendant, "would offend traditional notions of fair play and substantial justice." *Id.* at 113, 107 S.Ct. 1026. Because YMO/MANI have failed to establish that Meikikou had sufficient contacts with Minnesota and traditional notions of fair play and substantial justice would be offended by the district court's exercise of jurisdiction over Meikikou, we affirm the decisions of the court of appeals

and the district court dismissing the complaint against Meikikou.

Affirmed.

MEYER, J., took no part in the consideration or decision of this case.

ANDERSON, PAUL H., Justice (concurring).

I concur with the judgment of the court. Appellants Yamazaki Mazak Optonics Corporation (YMO) and Mazak Nissho Iwai Corporation (MANI) reached a full settlement with plaintiff James Juelich a week after we granted YMO and MANI's petition for review. As a result, this case now involves only a cross-claim for contribution by YMO, a Japanese corporation, and MANI, an Illinois corporation, against Meikikou, a Japanese corporation. Within this factual context, due to YMO and MANI's own actions, I disagree with YMO and MANI's argument that Minnesota has a sufficient interest in this case to warrant a holding that we have jurisdiction. Therefore, I concur with the majority's discussion of factors (4) and (5) of our five-part test and conclude that this is "one of those rare cases in which 'minimum requirements inherent in the concept of "fair play and substantial justice" * * * defeat the reasonableness of jurisdiction.'" *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 116, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (Brennan, J., concurring in part and in judgment) (quot-

implications for our country's relations with other nations requires a more stringent analysis of the minimum contacts that will satisfy due process than would be appropriate if a domestic corporation was the defendant. 480 U.S. at 115, 107 S.Ct. 1026; *see also* Gary B. Born, *Reflections on Judicial Jurisdiction in International Cases,* 17 Ga. J. Int'l & Comp. L. 1, 29 (1987) (positing that exorbitant jurisdiction claims "interfere with United States efforts to conclude international agreements

providing for mutual recognition and enforcement of judgments or restricting exorbitant jurisdictional claims by foreign states"). Thus, the unique burdens placed upon a foreign defendant who must defend itself in the American legal system should have some weight in assessing the reasonableness of extending personal jurisdiction over national borders. *Asahi,* 480 U.S. at 115, 107 S.Ct. 1026.

ing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477–78, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

My disagreement with the majority centers on its analysis of factors (1)-(3), by which it concludes that YMO and MANI "failed to establish that Meikikou had sufficient contacts with Minnesota." Like Justice John Paul Stevens in *Asahi,* I conclude that the court would be best served by stopping at the point of conducting an analysis of the reasonableness of jurisdiction because the lack of reasonableness is clear in this case. *See Asahi,* 480 U.S. at 121, 107 S.Ct. 1026 (Stevens, J., concurring in part and in judgment). A discussion of minimum contacts is both unnecessary and imprudent, given the unsettled state of stream of commerce due process analysis. Because our court has decided otherwise, I write separately to explain my disagreement by analyzing these factors as well.

(1) The quantity of contacts with the forum state

In *Rostad v. On–Deck, Inc.,* 372 N.W.2d 717, 722 (Minn.1985), we held that even though a foreign corporation did not have any direct contacts with Minnesota, it could be subject to jurisdiction in Minnesota courts. Further, we held in *Rostad* that jurisdiction in Minnesota was appropriate when the defendant made "calculated attempts to create a national market for [its] product, a market which specifically includes Minnesota." *Id.* at 721; *accord A. Uberti and C v. Leonardo,* 181 Ariz. 565, 892 P.2d 1354, 1362 (Ariz.1995) (noting that an "intent to sell across America is enough" to establish contacts for jurisdiction in a state).

The record reflects that as of May 2001, there were 122 Meikikou lift tables in use throughout the United States, including 17 in Minnesota. Evidence from a meeting between YMO representatives and Meiki-

kou representatives indicates that Meikikou was aware that its lift tables were destined for use by customers in the United States. Furthermore, evidence indicates Meikikou's desire to sell its products internationally. Meikikou is a member of two international business groups and maintains an English language website that discusses its "world-specification-standardized hardware" in "the scissor lifts area." It advertises its lift tables in English language brochures. It markets itself as being certified by an international standardization organization, which establishes and certifies a company's quality and environmental standards. Moreover, Meikikou has an insurance policy that covers U.S. products liability claims, which can evidence an awareness of the possibility of being haled into U.S. courts. Based on these facts, I would conclude that Meikikou has sufficient contacts to be subject to personal jurisdiction in Minnesota.

(2) The nature and quality of Meikikou's contacts

By placing its products into the stream of commerce, knowing they were bound for United States markets, Meikikou purposefully availed itself of the benefits of the Minnesota marketplace. In *Rostad,* we noted that "[i]n a commercial operation, sales are the most tangible contact with a jurisdiction." 372 N.W.2d at 722. We concluded in Rostad that, although the sales were made through intermediaries, sales in Minnesota created sufficient contacts for jurisdiction because they benefited the defendant. *Id.* Likewise, the record before us establishes that Meikikou was aware and undoubtedly intended that its lift tables penetrate the United States market. Meikikou undoubtedly intended to profit from the sale of its lift tables in Minnesota; thus, the nature and quality of its contacts weigh in favor of jurisdiction.

(3) The source and connection of the cause of action with these contacts

Like the defendant in *Rostad*, the record indicates that Meikikou sought to have its lift tables sold in the United States, contracting with others who made it happen. Unlike the New York dealership in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–98, 100 S.Ct. 559 (1980), which operated on an intra-state basis even though it must have foreseen that some of the vehicles it sold would be driven to other states, the evidence indicates that Meikikou was aware and intended that its lift tables would be sold and utilized in the United States. Though it is true that Meikikou had contractual relationships only with Japanese corporations, I would conclude that Meikikou should "not now be allowed to hide," *Rostad,* 372 N.W.2d at 722, when it undoubtedly intended to profit from sales in the United States, including Minnesota. As the Arizona Supreme Court said in *Leonardo,*

> Due process does not give foreign companies a safe harbor to manufacture goods designed for and shipped to America and at the same time immunize them from the penalties of noncompliance with American safety standards. Such a rule would drive American manufacturers out of business while allowing foreign businesses to produce, with absolute immunity, unreasonably dangerous and defective products for the American market.

892 P.2d at 1363.

While I agree with the majority that we should recognize the "unique burdens placed upon a foreign defendant who must defend itself in the American legal system" and consider this as a factor weighing on the reasonableness of jurisdiction, we should also recognize that the trend toward globalized business must factor into our analysis as well. Increased international travel and shipping, increased global communications, worldwide internet business, and the overall ability of a business to gain the benefits of participation in the global economy are a part of Minnesota's business and consumer environment today. Therefore, I respectfully disagree with the majority's analysis of the stream of commerce minimum contacts factors in our personal jurisdiction analysis.

GILBERT, Justice (concurring).

I join in the concurrence of Justice Paul H. Anderson.