*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1217**

Newman-Lakka Cancer Foundation,
Appellant,

vs.

Christine E. Briggs,
Respondent.

**Filed March 7, 2016
Affirmed
Rodenberg, Judge**

Hennepin County District Court
File No. 27-CV-14-19014

Marshall H. Tanick, Brian N. Niemczyk, Hellmuth & Johnson, PLLC, Edina, Minnesota (for appellant)

Kay Nord Hunt, Deborah C. Swenson, Lommen Abdo, P.A., Minneapolis, Minnesota; and Gregory J. Walsh, Walsh & Gaertner, P.A., St. Paul, Minnesota (for respondent)

Considered and decided by Rodenberg, Presiding Judge; Hooten, Judge; and Klaphake, Judge.*

**U N P U B L I S H E D   O P I N I O N**

**RODENBERG**, Judge

Appellant Newman-Lakka Cancer Foundation challenges the district court's dismissal of its defamation lawsuit after concluding that respondent Christine E. Briggs, a

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

resident of Massachusetts, is not subject to the personal jurisdiction of Minnesota's courts. Appellant also argues that the district court abused its discretion in denying appellant's request for jurisdictional discovery before dismissing the complaint on jurisdictional grounds. We affirm.

## FACTS

Appellant is a registered Minnesota nonprofit corporation that supports cancer-related medical research through fundraising and providing grants to researchers. Appellant focuses its efforts on a core of supporters and a dozen or more current or prospective donors, most located in Minnesota. One of appellant's grantees is the Newman-Lakka Institute at Tufts Medical Center in Boston, Massachusetts. GeneSys Research Institute, Inc. (GRI) is a separate cancer-related medical research facility, which is located and incorporated in Massachusetts. Two of appellant's officers, founder Charles Newman and David Horowitz, are members and directors of GRI. Respondent resides in Massachusetts and previously worked for GRI. As part of a reduction in staffing at GRI, respondent lost her job. This litigation arises from respondent's statements made on social media after her employment with GRI ended.

Appellant sued respondent, asserting that respondent had posted false and defamatory statements about appellant on social-media websites. Appellant's complaint specifically alleges that respondent made the following defamatory statements:

> a. On or about September 27, 2014, [respondent] posted on her public Facebook account an allegation that GRI – and by implication [appellant] – had misappropriated "millions in federal money belonging to The Center of Cancer Systems Biology."

2

b.  On or about October 6, 2014, [respondent] sent public messages on Twitter to dozens of major news organizations and political figures accusing GRI – and by implication [appellant] – of misusing and mismanaging cancer research funds.

c.  On or about October 8, 2014, [respondent] posted a link on her Twitter account to [appellant's] website and posted pictures of several members of [appellant's] board of directors. In connection with that information, [respondent] alleged that it was the "[s]ame board as GRI." The implication of [respondent's] October 8, 2014 Twitter posting was that [appellant] was involved in the financial mismanagement which [respondent] has falsely claimed occurred at GRI.

d.  On or about October 15, 2014, [respondent] founded a public Facebook page called "Save The Center of Cancer Systems Biology" ("the Public Facebook Page"). In the "About" section of the page, [respondent] alleges that GRI – and by implication [appellant] – misused and mismanaged cancer research funds.

e.  On or about October 19, 2014, [respondent] posted on the Public Facebook Page a letter co-written by her to the Massachusetts Attorney General's Office accusing GRI and [appellant] of misusing and mismanaging cancer research funds, among other things.

f.  On or about October 22, 2014, [respondent] posted on the Public Facebook Page a link to [appellant's] website and posted pictures of several members of [appellant's] board of directors. In connection with that information, [respondent] alleges that GRI's board members were "also board members of a rival organization" – [appellant]. The implication of [respondent's] October 22, 2014 Public Facebook Page posting was that [appellant] was involved in the financial mismanagement which [respondent] has falsely claimed occurred at GRI.

g.  On or about November 6, 2014, [respondent] posted on the Public Facebook Page a link to [appellant's] website

3

and posted pictures of several members of [appellant's] board of directors. In connection with that posting, [respondent] again accused [appellant] of being involved in the financial mismanagement which [respondent] has falsely claimed occurred at GRI.

Respondent moved the district court to dismiss the complaint for lack of personal jurisdiction. Appellant opposed the motion, and in the alternative requested leave to conduct jurisdictional discovery before a ruling on the personal-jurisdiction issue.

After a hearing, the district court granted respondent's motion. The district court concluded, in part, that appellant "failed to make a prima facie showing of personal jurisdiction [under the *Calder* effects test] because it has made no allegations and offered no evidence that Minnesota was the focal point of [respondent's] activity or that [respondent] expressly aimed her defamatory statements at Minnesota." The district court also concluded that Minnesota lacks personal jurisdiction over respondent under Minnesota's traditional five-factor test, and it denied appellant's request for jurisdictional discovery. This appeal followed.

## D E C I S I O N

### I.    Personal Jurisdiction

Appellant challenges the district court's dismissal of the action for want of personal jurisdiction, arguing that respondent's publicly accessible Internet postings concerning a Minnesota nonprofit corporation constitute sufficient minimum contacts with this state to allow the exercise of personal jurisdiction over appellant consistent with due process. *See Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410 (Minn. 1992) (noting that "the long-arm statute [] extend[s] the personal jurisdiction of

4

Minnesota courts as far as the Due Process Clause of the federal constitution allows"). We review de novo whether personal jurisdiction exists. *Volkman v. Hanover Invs., Inc.*, 843 N.W.2d 789, 794 (Minn. App. 2014).

To establish personal jurisdiction, appellant must make a prima facie showing of jurisdiction, accepting the complaint and supporting evidence as true. *Hardrives, Inc. v. City of LaCrosse*, 307 Minn. 290, 293, 240 N.W.2d 814, 816 (Minn. 1976). We view the evidence in the light most favorable to appellant, the original plaintiff. *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). In a close case, we resolve doubts in favor of retaining jurisdiction. *Hardrives*, 307 Minn. at 296, 240 N.W.2d at 818.

A Minnesota court may exercise personal jurisdiction over an out-of-state defendant as long as jurisdiction is authorized by the long-arm statute and satisfies constitutional due-process requirements. *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 570 (Minn. 2004). Minnesota's long-arm statute extends personal jurisdiction over nonresident defendants to the limits of federal due process. Minn. Stat. § 543.19, subd. 1 (2014). Therefore, the appropriate test is whether a nonresident defendant has sufficient minimum contacts with Minnesota such that exerting personal jurisdiction over her "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945) (quotation omitted). Federal caselaw is instructive in applying this test because Minnesota's "long-arm statute [] extend[s] the personal jurisdiction of Minnesota courts

as far as the Due Process Clause of the federal constitution allows." *Valspar*, 495 N.W.2d at 410.

Minimum contacts may be established through general or specific jurisdiction. *Domtar, Inc. v. Niagara Fire Ins. Co.*, 533 N.W.2d 25, 30 (Minn. 1995). Appellant argues only that Minnesota can constitutionally assert specific jurisdiction over respondent. Specific jurisdiction exists when the cause of action arises from a defendant's contacts with the forum. *Domtar*, 533 N.W.2d at 30. The district court applied both the *Calder* effects test, *see Griffis v. Luban*, 646 N.W.2d 527, 534-35 (Minn. 2002), and Minnesota's traditional five-factor test under *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 570 (Minn. 2004).[1]

## A. The *Calder* effects test

In intentional-torts cases, Minnesota courts apply the *Calder* effects test for specific jurisdiction, evaluating whether a defendant has sufficient minimum contacts by focusing on the in-state effects of tortious conduct that occurred outside of the state. *Calder v. Jones*, 465 U.S. 783, 789, 104 S. Ct. 1482, 1486-87 (1984); *Griffis*, 646 N.W.2d at 534-35. The *Calder* effects test requires the plaintiff to show that

> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm caused by that tort in the forum such that the forum state was the focal point of the plaintiff's injury; and (3) the defendant expressly aimed the

---

[1] There is no Minnesota case holding that, when personal jurisdiction may not be constitutionally exercised under the *Calder* effects test, it may instead be exercised under the traditional five-factor test. But the parties use both tests to advance their arguments on appeal, and we address the appeal as it has been briefed. Because both tests lead to the same result on these facts, we need not consider whether both are necessary when *Calder* applies.

tortious conduct at the forum such that the forum state was the focal point of the tortious activity.

*Griffis*, 646 N.W.2d at 534.

Here, the first part of the test is satisfied: appellant alleges that respondent defamed it. Taking the complaint as true, appellant has sufficiently demonstrated the second part of the test, that harm or injury was suffered in Minnesota, because appellant is a Minnesota nonprofit corporation. Therefore, the *Calder* effects test turns on the third part of the test: whether respondent "expressly aimed the tortious conduct at the forum such that the forum state was the focal point of the tortious activity." *Griffis*, 646 N.W.2d at 534.

In *Griffis*, an Alabama plaintiff (Griffis) brought a defamation suit in Alabama against a Minnesota resident. *Id.* at 530. Griffis alleged that the defendant defamed her professional credentials in posts on an Internet newsgroup. *Id.* The Alabama court entered a default judgment, which Griffis sought to enforce in Minnesota. *Id.* The Minnesota Supreme Court adopted the *Calder* effects test, stating that the "constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum." *Id.* at 534 (quotation omitted). The supreme court held that Griffis did not meet the test's third requirement because (1) the newsgroup was accessible to anyone in the world, (2) nothing indicated the statements were targeted at Alabama beyond the fact that Griffis lived there, (3) Griffis presented no evidence that any other person in Alabama read the statements, and (4) Griffis did not assert that Alabama had a unique relationship with her professional field. *Id.* at 535-36.

*Griffis* is consistent with federal caselaw concerning similar factual scenarios. In *BroadVoice, Inc. v. TP Innovations LLC*, a Massachusetts company brought a defamation suit in Massachusetts against Texas defendants. 733 F. Supp. 2d 219, 221-22 (D. Mass. 2010). The plaintiff alleged that the Texas defendants created a website, which included complaints, defamatory comments, and an "open letter" to the plaintiff accusing it of criminal business practices. *Id.* at 222. The website urged others to complain to the company and submit complaints to the Massachusetts Attorney General and the Boston Better Business Bureau. *Id.* The website provided links to those agencies' websites. *Id.* The court held that the plaintiff did not satisfy the third part of the *Calder* effects test—defendant's activities were not aimed at Massachusetts—because the website did nothing to incite Massachusetts residents in particular. *Id.* at 225-26. Specifically, the court noted that there was no supporting evidence that any Massachusetts resident other than the plaintiff accessed the website, and although Massachusetts residents could access the website, so could people from anywhere in the world. *Id.* at 225-26.

*Johnson v. Arden* concerned a defendant's social-media posts stating that a Missouri cat breeder tortured and killed cats, sold infected animals, and "operated a 'kitten mill' in Unionville, Missouri." 614 F.3d 785, 796 (8th Cir. 2010). In holding that the posts did not specifically target Missouri, the court noted that the posts concerned the plaintiff, the reference to Missouri was incidental, and there was no evidence that the website or its content focused on Missouri. *Id.*

In *Griffis*, much like this case, the complaint alleged that the defendant

8

posted statements on the [Internet] newsgroup asserting that Griffis obtained membership in the International Association of Egyptologists and inclusion on other lists of Egyptologists by misrepresenting her qualifications, that Griffis was a liar, was not affiliated with the University of Alabama, did not have a juris doctor degree, and that Griffis's consulting business was not legitimate.

*Griffis*, 646 N.W.2d at 530. Like *Griffis*, there is no evidence here that respondent's Facebook and Twitter posts were directed at Minnesota. Respondent's posts were accessible to the public. Appellant has neither asserted nor presented evidence that Minnesota residents other than Mr. Newman read them. Appellant only asserts that the posts' subject matter makes it *more likely* that the Minnesota donor base read these posts than other members of the general public. Just as in *Griffis*, the social-media audience is worldwide. The fact that the posts "*could* have been read in [Minnesota], just as they *could* have been read anywhere in the world, cannot suffice to establish [Minnesota] as the focal point of the defendant's conduct." *Griffis*, 646 N.W.2d at 536.

Similar to *BroadVoice*, there is no claim or evidence that respondent's posts were intended to incite Minnesotans. Only four of respondent's alleged social-media posts reference appellant, and none mention Minnesota or even appear to be directed at Minnesota. Instead, the posts refer to and urge action in Massachusetts. As in *BroadVoice*, respondent provided a link to a Massachusetts agency. To the extent that the posts called for action, they called for action in Massachusetts. This is insufficient to show that Minnesota was the focal point of the tortious conduct.

*Calder*, from which the effects tests developed, is notably distinguishable. It involved a libelous magazine circulated to 600,000 people in California, which included a

9

story concerning the California activities of a California resident tied to the California entertainment business. 465 U.S. at 785, 104 S. Ct. at 1484. In this case, respondent's posts were circulated to a worldwide audience and involved primarily Massachusetts activities. Most of the claimed improprieties were alleged to have occurred in Massachusetts, and involved GRI. Appellant's complaint repeatedly alleges that these claims "by implication" concerned appellant. Allegations that "by implication" defame a Minnesota resident fall far short of making Minnesota the focal point of the tortious conduct.[2]

Appellant asserts that the district court's order represents bad public policy, in that "nonresidents can commit defamation with impunity against Minnesota residents (businesses or individuals) as long as they do not simultaneously 'refer' to the state where the harm is most likely to occur." *Griffis* only indicates that mere speculation concerning the in-state impacts of out-of-state intentional torts is insufficient to establish personal jurisdiction. 646 N.W.2d at 536. Were there specific claims or evidence tending to show that Minnesota residents saw the posts or that respondent directed her social-media posts at a Minnesota resident, *Griffis* might indicate a different result concerning jurisdiction over the nonresident. Moreover, appellant's policy argument seeks to modify or extend existing law, which is the role of the Minnesota Supreme Court, and not our proper role.

---

[2] Even taking appellant's claims as true, it is questionable whether a Minnesota resident was defamed "by implication" or otherwise. We note that some of respondent's social-media posts concerning Newman-Lakka referenced Tufts Medical Center, which suggests that the posts might have been referring to the Newman-Lakka Institute in Massachusetts, rather than the Newman-Lakka Cancer Foundation in Minnesota. But for purposes of our analysis, we assume that the posts refer to appellant and not the similarly named institute.

*See Tereault v. Palmer,* 413 N.W.2d 283, 286 (Minn. App. 1987) ("[T]he task of extending existing law falls to the supreme court or the legislature, but it does not fall to this court."), *review denied* (Minn. Dec. 18, 1987).

Applying the *Calder* effects test to appellant's claims, the complaint is insufficient to establish specific jurisdiction over respondent in Minnesota.

**B. The Minnesota five-factor test**

The district court also evaluated the constitutionality of Minnesota's exercise of long-arm jurisdiction in this case by applying the traditional five-factor test: (1) the quantity of the defendant's contacts with Minnesota; (2) the nature and quality of the defendant's contacts with Minnesota; (3) the connection between the claims and the defendant's contacts; (4) Minnesota's interest in providing a forum; and (5) the convenience of the parties. *Juelich*, 682 N.W.2d at 570. "The first three factors determine whether minimum contacts exist and the last two factors determine whether the exercise of jurisdiction is reasonable according to traditional notions of fair play and substantial justice." *Id.* "The first three factors are the primary factors, with the last two deserving lesser consideration." *Dent-Air, Inc. v. Beech Mountain Air Serv., Inc.*, 332 N.W.2d 904, 907 (Minn. 1983).[3]

*1. Quantity of contacts*

We first consider whether a defendant's contacts were "numerous and fairly frequent or regular in occurrence." *Hardrives, Inc.*, 307 Minn. at 295, 240 N.W.2d at

---

[3] Although we conclude that the complaint is insufficient to establish specific jurisdiction over respondent in Minnesota under the *Calder* effects test, we address the parties' arguments concerning the traditional five-factor test. *See supra* note 1.

817. Where contacts are few and isolated, this factor weighs against jurisdiction and an appellant must instead rely on the nature and quality of contacts to establish personal jurisdiction. *See Trident Enters. Int'l, Inc. v. Kemp & George, Inc.*, 502 N.W.2d 411, 415 (Minn. App. 1993) (holding that less than ten contacts is minimal and that where quantity is minimal, quality and nature of contacts may establish personal jurisdiction).

Appellant identifies seven specific Facebook and Twitter postings. Of those, only four mention appellant. None mention Minnesota. Because of the small number of identifiable posts having any connection with the state of Minnesota, and because of the smaller number which even mention appellant, the first factor weighs against the exercise of jurisdiction.

### 2. *Nature and quality of contacts*

Courts also consider the nature and quality of contacts to determine whether a nonresident defendant "purposefully availed" herself of the benefits and protections of Minnesota law. *Dent-Air*, 332 N.W.2d at 907. Many courts use the *Zippo* "sliding scale" test to determine whether a defendant's Internet activity satisfies the requirements to assert personal jurisdiction over a nonresident defendant. *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997); *see Juelich*, 682 N.W.2d at 574 (applying the passive-versus-active test in evaluating an Internet website). A highly interactive website supports personal jurisdiction where the defendant enters into contracts with a foreign resident and there is a "knowing and repeated transmission of computer files over the Internet." *Zippo*, 952 F. Supp. at 1124. *Zippo* describes a passive website as one that "does little more than make information available to those who are

interested in it" and holds that such a website "is not grounds for the exercise [of] personal jurisdiction." *Id.* "The middle ground is occupied by interactive [websites] where a user can exchange information with the host computer." *Id.* For websites in the middle, courts examine the extent of interactivity and the commercial nature of the website. *Id.*

In assessing the nature and quality of contacts, we first consider where respondent's posts fall on the sliding scale. Facebook and Twitter are highly interactive social-media platforms allowing users to engage in conversations, whether through a computer or Internet-capable mobile device. The sites are not, however, generally used for business transactions, and respondent is not alleged to have so used them. Instead, she did "little more than make information available to those who are interested in it." *Id.* Therefore, respondent's activity falls in the middle ground.

Because respondent's activity falls in the middle ground, we consider the extent of the interactivity and the commercial nature of the posts. Respondent's posts are not commercial in the way that most cases consider that quality; if anything, they seek to stop the flow of money. Although respondent encourages activity in the posts, that activity is entirely directed at Massachusetts, not Minnesota. Minnesota is not even mentioned in the posts. Unlike cases in which a nonresident directs Internet communications into a forum, respondent's posts were only generically available to the Internet community at large. *See Zidon v. Pickrell*, 344 F. Supp. 2d 624, 631 (D.N.D. 2004) (holding that North Dakota had jurisdiction in an Internet-defamation case where the Colorado defendant emailed links to the defamatory website to people in North Dakota, where plaintiff

13

resided).  Here, the generic accessibility of respondent's posts is insufficient to support an exercise of personal jurisdiction over respondent.  *See Quality Improvement Consultants, Inc. v. Williams*, No. 02-3994 (JEL/JGL), 2003 WL 543393, at *6 (D. Minn. Feb. 24, 2003) (noting that, without more, Internet activity at the middle ground cannot support personal jurisdiction because otherwise "due process would impose little restraint on the Court's ability to exercise jurisdiction over every e-commerce entrepreneur who offers goods or services for sale online").  Based on the marginally interactive, non-commercial nature of appellant's contacts, and their tenuous and indirect effect on Minnesota, we conclude that the second factor weighs against the exercise of jurisdiction.

### 3. *Connection of the contacts with the cause of action*

Respondent's contacts—the social-media postings—are directly connected to appellant's cause of action that arises out of its alleged harm caused by the defamatory postings.  Therefore, the third factor weighs in favor of establishing personal jurisdiction.

### 4. *Minnesota's interest in providing a forum*

The fourth and fifth factors concern whether it is reasonable to exercise jurisdiction.  *Juelich*, 682 at 570.  Appellant is a registered Minnesota nonprofit corporation, and as such, the state has an interest in providing appellant a forum to litigate its claims against nonresident defendants.  That interest, however, is minimal "for a dispute that has no connection to the state."  *Westley v. Mann*, 896 F. Supp. 2d 775, 792 (D. Minn. 2012).  The *Calder* effects test and five-factor test demonstrate that appellant's dispute with respondent concerns Minnesota only to the extent that appellant is registered

14

in the state as a nonprofit corporation. This is an insufficient interest for the purposes of exercising personal jurisdiction. The fourth factor weighs against exercising jurisdiction.

### 5. *Convenience of the parties*

Convenience of the parties "is irrelevant unless the defendant also has, as a threshold matter, sufficient contacts with the forum state." *W. Am. Ins. Co. v. Westin, Inc.*, 337 N.W.2d 676, 679 (Minn. 1983). The fifth factor is therefore irrelevant and does not weigh in favor of exercising jurisdiction.

Only the third of the five relevant factors supports exercising jurisdiction. Therefore, under the Minnesota five-factor test, Minnesota may not constitutionally assert personal jurisdiction over respondent.

## II.    Jurisdictional Discovery

Appellant also argues that the district court erred in denying appellant's request for jurisdictional discovery. We review a district court's decision whether to grant jurisdictional discovery for an abuse of discretion. *Behm v. John Nuveen & Co.*, 555 N.W.2d 301, 305 (Minn. App. 1996).

Jurisdictional discovery is generally permitted before a court rules on a motion to dismiss for lack of personal jurisdiction, but such discovery is "unnecessary where the discovery is unlikely to lead to facts establishing jurisdiction." *Id.* A motion for jurisdictional discovery must be supported by more than speculation that relevant information exists, and a party generally may not use discovery to conduct a "fishing expedition." *Rice v. Perl*, 320 N.W.2d 407, 412 (Minn. 1982).

Here, appellant sought jurisdictional discovery for the purpose of testing the "veracity and accuracy" of respondent's attestation that she had no intention to direct the defamatory statement to anyone in Minnesota. But in denying appellant's request for jurisdictional discovery, the district court concluded that "[respondent's] affidavit carried no weight in the Court's decision on personal jurisdiction." Instead, the district court properly based its decision concerning jurisdiction on appellant's complaint and the assertions therein: "[Appellant] has the burden of making a *prima facie* case of personal jurisdiction and its failure to do so turned on its own allegations and evidence, not [respondent's] affidavit." Properly considering appellant's complaint as true, and properly disregarding respondent's factual allegations, the district court acted within its discretion in concluding that deposing respondent would not lead to facts establishing jurisdiction.

In sum, the district court acted within its discretion in denying jurisdictional discovery. Faithfully applying existing precedent, and properly taking all of appellant's claims as true, the district court concluded that Minnesota may not constitutionally assert personal jurisdiction over respondent, a nonresident. On de novo review, we see no error by the district court.

**Affirmed.**