Douglas W. BUTLER, et al., Respondents,

v.

JLA INDUSTRIAL EQUIPMENT, INC. d/b/a Hotsy Equipment of Minnesota, Respondent,

Schieffer Co. International, LC, Respondent,

Alfred Karcher, Inc. d/b/a Karcher North America, et al., Defendants,

Magam Enterprises Group, Appellant.

No. A13–1448.

Court of Appeals of Minnesota.

April 21, 2014.

Craig A. Goudy, Cox, Goudy, McNulty & Wallace, P.L.L.P., Minneapolis, MN, for respondents Douglas and Lesia Butler.

Blake Duerre, Beth A. Jenson Prouty, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, MN, for respondent JLA Industrial Equipment.

Lisa R. Griebel, Sean J. Mickelson, Terhaar, Archibald, Pfefferle & Griebel, LLP, Minneapolis, MN, for respondent Schieffer Co.

Paul R. Smith, Lauris A. Heyerdahl, Andrew D. Moran, Larkin Hoffman Daly & Lindgren, Ltd., Minneapolis, MN, for appellant.

Considered and decided by ROSS, Presiding Judge; BJORKMAN, Judge; and HOOTEN, Judge.

## OPINION

HOOTEN, Judge.

Appellant challenges the district court's denial of its motion for summary judgment, arguing that the district court erred by concluding that it had personal jurisdiction over appellant. Because appellant had sufficient minimum contacts with Minnesota and because litigating in Minnesota would not be unfair or unreasonable, we affirm.

## FACTS

Respondent Douglas Butler is a former employee of Aspen Waste Systems. In April 2006, Butler was washing his garbage truck with a pressure washer when the washer's water hose burst. Hot water burned Butler's hand, thigh, and shoulder. Butler and his wife brought a products-liability suit against appellant Schieffer–

Magam Industries, Ltd. (SMI),[1] respondent Schieffer Co. International, LC (Schieffer), respondent JLA Industrial Equipment, Inc., d/b/a Hotsy Equipment of Minnesota (Hotsy), Alfred Karcher, Inc., d/b/a/ Karcher North America (Karcher), and C–Tech Industries (C–Tech) (together, defendants).[2] Butler alleged that the defendants were engaged "in the manufacture, distribution and/or sale of industrial products including specifically pressure washers and their attendant parts and components."

SMI, an Israeli corporation with its principal place of business in Israel, moved to dismiss, arguing that Minnesota courts lack personal jurisdiction. The district court reserved the motion so that the parties could conduct discovery regarding jurisdictional issues. Upon completion of discovery, the district court considered the motion as one for summary judgment.

Discovery revealed the following facts. SMI manufactures hydraulic hoses. SMI and Schieffer are two of three subsidiaries of a German parent company. Between 2000 and 2011, SMI sold hydraulic hoses in bulk to Schieffer, a company based in Iowa. Schieffer manufactured the hoses into finished products and distributed them nationwide, including to Hotsy, a Minnesota company.

Between 2001 and 2011, SMI sold approximately 71,015,269 feet of hose to four U.S. customers in Georgia, New Jersey, Texas, and Iowa. This constituted about $1.3 to 4 million in annual sales to U.S. customers, or about 21 to 32% of its total sales. During this same time period, SMI sold to Schieffer between $1 and 3.5 million worth of hose annually, approximately 87% of SMI's total U.S. sales. Based on its submission of more than 50 invoices, Schieffer represented that, between 2004 and 2007, it sold approximately 28,000 feet of SMI-manufactured hose to Hotsy.

SMI asserted that it is a separate corporation from Schieffer, does not manufacture a finished product but simply provides bulk hoses on large spools, and has no distribution contracts or licensing arrangements with Schieffer or any Minnesota or U.S. companies. It does not advertise in, ship products to, or attend trade shows in Minnesota, or sell its products directly to Minnesota customers. It has no employees, bank accounts, real estate, or offices in the U.S. SMI has no written distribution contracts, agreements, or licensing arrangements with U.S. manufacturers or distributors. SMI also claimed that it had no contact with or knowledge of Schieffer's customers, including its customers in Minnesota.

Jeffrey D. Theis, managing member and president of Schieffer, testified by affidavit that Schieffer and SMI had common shareholder ownership at the time of Butler's accident. He stated that SMI shareholders and personnel from Israel visited Schieffer's facility regularly on at least an annual basis for the purpose of supporting Schieffer's "development of the market through product and pricing aimed at the entire United States' market." According to Theis, "[SMI] was aware that Schieffer ... sold hoses manufactured by [SMI] to

---

1. The Butlers' complaint identifies Magam Enterprises Group, rather than SMI, as a defendant, but the parties refer to SMI as the defendant manufacturer of the hydraulic hose throughout the proceedings and have not raised this misidentification as an issue on appeal.

2. Karcher and C–Tech were later dismissed from the action.

customers across the United States, including customers located in Minnesota," "[SMI] did not attempt to limit the territory in which Schieffer ... sold its products," and "[SMI] encouraged sales of its products throughout the entire United States."

The district court denied SMI's motion for summary judgment, concluding that SMI had sufficient minimum contacts with Minnesota and that litigating the suit in Minnesota was not unreasonable or unfair. This appeal follows.

## ISSUE

Did the district court err by concluding that Minnesota courts may constitutionally exercise personal jurisdiction over SMI?

## ANALYSIS

■ An order denying a motion for summary judgment for lack of personal jurisdiction is immediately appealable as a matter of right. *Marshall v. Inn on Madeline Island,* 610 N.W.2d 670, 673 (Minn.App.2000). We review de novo a district court's summary-judgment decision. *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC,* 790 N.W.2d 167, 170 (Minn.2010). In doing so, we determine whether there are genuine issues of material fact and whether the district court erred in its application of the law. *Osborne v. Twin Town Bowl, Inc.,* 749 N.W.2d 367, 371 (Minn.2008).

■ Whether personal jurisdiction exists is a question of law reviewed de novo. *Juelich v. Yamazaki Mazak Optonics Corp.,* 682 N.W.2d 565, 569 (Minn.2004). In order for a Minnesota court to exercise personal jurisdiction over a foreign corporation, Minnesota's long-arm statute,

Minn.Stat. § 543.19 (2012), must be satisfied and there must be minimum contacts between the defendant and Minnesota to satisfy the due process clause of the Fourteenth Amendment. *Stanek v. A.P.I., Inc.,* 474 N.W.2d 829, 832 (Minn.App.1991), *review denied* (Minn. Oct. 31, 1991). "[T]he legislature designed the long-arm statute to extend the personal jurisdiction of Minnesota courts as far as the Due Process Clause of the federal constitution allows." *Valspar Corp. v. Lukken Color Corp.,* 495 N.W.2d 408, 410 (Minn.1992). "If the personal jurisdiction requirements of the federal constitution are met, the requirements of the long-arm statute will necessarily be met also. Thus, when analyzing most personal jurisdiction questions, Minnesota courts may simply apply the federal case law." *Id.* at 411.

■ "Due process requires that the defendant have 'certain minimum contacts' with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" *Juelich,* 682 N.W.2d at 570 (footnote omitted) (quoting *Burnham v. Superior Court of Cal.,* 495 U.S. 604, 618, 110 S.Ct. 2105, 2115, 109 L.Ed.2d 631 (1990)). At the pretrial stage, the plaintiff bears the burden of proving that sufficient contacts exist to support personal jurisdiction. *V.H. v. Estate of Birnbaum,* 543 N.W.2d 649, 653 (Minn.1996). But the plaintiff need only make a prima facie showing of sufficient contacts through the complaint and supporting evidence, which are taken as true. *Juelich,* 682 N.W.2d at 570. "[I]n doubtful cases, doubts should be resolved in favor of retention of jurisdiction." *Hardrives, Inc. v. City of LaCrosse,* 307 Minn. 290, 296, 240 N.W.2d 814, 818 (1976).

■ When determining whether the exercise of personal jurisdiction over a for-

eign defendant is consistent with due process, we evaluate: "(1) the quantity of contacts with the forum state; (2) the nature and quality of those contacts; (3) the connection of the cause of action with these contacts; (4) the interest of the state providing a forum; and (5) the convenience of the parties." *Juelich*, 682 N.W.2d at 570. "The nature and quality of the requisite contacts varies depending on whether the type of jurisdiction being asserted is general or specific." *Id.* at n. 3.

 SMI contends that neither general nor specific jurisdiction applies here. "General personal jurisdiction exists when a nonresident defendant's contacts with the forum state are so substantial and are of such a nature (continuous and systematic) that the state may assert jurisdiction over the defendant even for causes of action unrelated to the defendant's contacts with the forum state." *Id.* The contacts must be "so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, — U.S. —, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) (quotation omitted). The parties agree that SMI does not have direct contacts with Minnesota and SMI's indirect contacts are not of a nature to render it essentially at home in Minnesota. We agree with SMI that the evidence does not support a finding of general personal jurisdiction.

 Specific personal jurisdiction, on the other hand, exists when the contacts with the forum are limited but connected with the underlying "claim such that the claim arises out of or relates to the defendant's contacts with the forum." *Juelich*, 682 N.W.2d at 570 n. 3. "Flow of a manufacturer's products into the forum ... may bolster an affiliation germane to specific jurisdiction." *Goodyear*, 131 S.Ct. at 2855 (emphasis omitted). The "stream of commerce" theory "refers to the movement of goods from manufacturers through distributors to consumers." *J. McIntyre Machinery, Ltd. v. Nicastro*, — U.S. —, 131 S.Ct. 2780, 2788, 180 L.Ed.2d 765 (2011) (plurality opinion).

All parties agree that this appeal concerns an examination of specific personal jurisdiction under the stream-of-commerce theory. Over the past 34 years, the stream-of-commerce theory has been analyzed and reanalyzed by this court, the Minnesota Supreme Court, and the U.S. Supreme Court. Despite this attention, the U.S. Supreme Court justices dispute the theory's correct application. Because the U.S. Supreme Court has recently reviewed the stream-of-commerce theory but failed to secure a majority on its correct application, we take this opportunity to review the seminal cases and those cited by the parties to determine whether and to what extent the stream-of-commerce theory applies in this case.

The U.S. Supreme Court first recognized the stream-of-commerce theory in *World–Wide Volkswagen Corp. v. Woodson*:

When a corporation purposefully avails itself of the privilege of conducting activities within the forum State, it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or

distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.

444 U.S. 286, 297–98, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (quotation and citation omitted).

Despite recognizing this new theory of personal jurisdiction, the U.S. Supreme Court declined to apply it in *World–Wide Volkswagen*. The U.S. Supreme Court concluded that Oklahoma could not exercise jurisdiction over a nonresident automobile retailer and its nonresident wholesale distributor because their only connection with Oklahoma was that one of their automobiles, which was sold in New York to New York residents, was involved in an automobile accident in Oklahoma. *Id.* at 288, 295, 100 S.Ct. at 562, 566.

Five years later, the Minnesota Supreme Court decided *Rostad v. On–Deck, Inc.*, 372 N.W.2d 717 (Minn.1985). In that case, On–Deck, a New Jersey corporation that manufactured bat weights, was not licensed to do business in Minnesota and had no officers, property, or agents in Minnesota. *Id.* at 718. The supreme court acknowledged that On–Deck had no direct contacts with Minnesota, but determined that it had "a plethora of indirect contacts" supporting the exercise of jurisdiction. *Id.* at 721. On–Deck sold "a

great number" of bat weights through distributors. *Id.* at 718. On–Deck contracted with a distributor to exclusively distribute the bat weights in North America, Hawaii, and the islands within the Caribbean and Gulf of Mexico, "a market which specifically includes Minnesota." *Id.* at 718–19, 721. On–Deck's president and inventor traveled extensively throughout the country to market the bat weight. *Id.* at 719. And plaintiffs produced sales receipts and affidavits from sports-store owners indicating that the weights had been popular in Minnesota for a number of years. *Id.* at 719.

In concluding that Minnesota courts could exercise personal jurisdiction over On–Deck, our supreme court adopted the stream-of-commerce theory from *World–Wide Volkswagen*. *Id.* at 721. The supreme court explained that "the fairness requirement of due process does not extend so far as to permit a manufacturer to insulate itself from the reach of the forum state's long-arm rule by using an intermediary or by professing ignorance of the ultimate destination of its products." *Id.* (quotation omitted).

The U.S. Supreme Court next examined the stream-of-commerce theory in *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In *Asahi*, plaintiff, a nonresident of California, sued the Taiwanese manufacturer of motorcycle tire inner tubes in California after he was injured and his wife was killed in a motorcycle accident. 480 U.S. at 105–06, 114, 107 S.Ct. at 1029, 1033. The Taiwanese manufacturer filed a cross-complaint against Asahi, the Japanese manufacturer of the tubes' valve assembly. *Id.* at 106, 107 S.Ct. at 1029. Plaintiff's claims were settled and dismissed, leaving only the indemnity action.

*Id.* The Supreme Court unanimously held that California could not exercise personal jurisdiction over the parties in the indemnity dispute. *Id.* at 108, 107 S.Ct. at 1030.

But the Supreme Court was split on the proper application of the stream-of-commerce theory. Justice O'Connor, joined by Chief Justice Rehnquist and Justices Powell and Scalia, rejected the California Supreme Court's application of the stream-of-commerce theory that "mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum State while still in the stream of commerce." *Id.* at 111, 107 S.Ct. at 1031. Instead, Justice O'Connor concluded that personal jurisdiction is proper under the stream-of-commerce theory when the defendant purposefully directs its product at the forum through additional conduct that indicates an intent or purpose to serve the market in the forum, "for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* at 112, 107 S.Ct. at 1032.

Justice Brennan, joined by Justices White, Marshall, and Blackmun, rejected Justice O'Connor's approach requiring "additional conduct." *Id.* at 117, 107 S.Ct. at 1034 (Brennan, J., concurring in part and concurring in the judgment). Justice Brennan explained that the stream-of-commerce theory "refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Id.*

As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State.

*Id.* at 117, 107 S.Ct. at 1034–35.

Justice Stevens, joined by Justices White and Blackmun, also rejected Justice O'Connor's approach in a second concurring opinion, concluding that a new rule was unnecessary given that eight of the nine justices agreed that the exercise of jurisdiction would be "unreasonable and unfair." *Id.* at 121, 107 S.Ct. at 1037 (Stevens, J., concurring in part and concurring in the judgment). Justice Stevens added that the "purposeful availment" standard required examining "the volume, the value, and the hazardous character of the components." *Id.* at 122, 107 S.Ct. at 1037. "In most circumstances," he wrote, "I would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute purposeful availment even though the item delivered to the forum State was a standard product marketed throughout the world." *Id.* (quotation marks omitted).

Four years after *Asahi*, we decided *Stanek*, which involved a case against Lake Asbestos of Quebec, Ltd. (LAQ). 474 N.W.2d at 830. LAQ was a Delaware corporation with its principal place of busi-

ness in Canada. *Id.* at 831. LAQ did not maintain offices or bank accounts in Minnesota, employ officers or employees in Minnesota, own or lease real property in Minnesota, have a listing in a Minnesota telephone directory, or advertise in the Minnesota media. *Id.*

We determined that the quantity of LAQ's indirect contacts with Minnesota weighed in favor of exercising personal jurisdiction. *Id.* at 834. LAQ supplied its products to several manufacturers and large U.S. corporations, which led "to the natural inference that the [product] was to be put into the nationwide stream of commerce through the marketing of one or more of those major corporations." *Id.* at 831, 833. We added, "It is also reasonable to infer that the [product] reached Minnesota, a major manufacturing and industrial center of the upper Midwest." *Id.* at 833. In examining the quality of LAQ's contacts, we stated that LAQ "profited from the widespread sale of [its product]" through "large American distributors" and that "the insidious and long-term effects [of the product] have been recognized due to the unique character of the product." *Id.* at 834–35.

We also noted that five justices in *Asahi* rejected Justice O'Connor's requirement of additional conduct directed toward the target forum when analyzing minimum contacts under the stream-of-commerce theory, but nonetheless determined that there was "quite a bit more" contact between LAQ and Minnesota than just the flow of its products into the state. *Id.* at 833–34. LAQ had previously sold its products to a plant in Minneapolis, worked with a Minnesota sales representative, and corresponded with, sent a salesperson to visit, and mailed price lists to a large Minnesota company. *Id.* at 834.

The Minnesota Supreme Court denied review of *Stanek,* but revisited the stream-of-commerce theory in *Juelich.* In *Juelich,* plaintiff was injured while performing maintenance on a scissor-lift table manufactured by Meikikou, a Japanese corporation. 682 N.W.2d at 568. Meikikou sold the table to its Japanese distributor in Japan. *Id.* The table was eventually delivered to another entity in Japan, who then delivered it to YMO, the Japanese manufacturer that used the table as a component part of a laser-cutting table-system. *Id.* YMO sold the table-system to its Illinois subsidiary, who in turn sold the table-system to a Minnesota supplier, who sold the table-system to plaintiff's employer. *Id.*

In reviewing our decision, the supreme court determined that we erred by relying on Justice O'Connor's approach to the stream-of-commerce theory because a majority of the justices did not agree on the proper test. *Id.* at 572. Instead, the supreme court concluded that "the first three factors of our five-factor test ... continue to provide the proper framework for determining whether a foreign defendant has sufficient minimum contacts with Minnesota to support an exercise of personal jurisdiction." *Id.* The supreme court stated that the fourth and fifth factors continue to be consistent with U.S. Supreme Court precedent because a majority of justices in *Asahi* agreed that the exercise of jurisdiction would be "unreasonable and unfair" after weighing "the burden on the defendant, the interests of the forum state, and the plaintiff's interest in obtaining relief." *Id.* at 572–73.

The supreme court, in holding that the Minnesota courts did not have personal jurisdiction over Meikikou, explained:

> Meikikou manufactured only a component part, did not create, control or even

influence the distribution by YMO of the finished product, and took no initiative in developing a United States market. Although Meikikou took certain actions to enable YMO to market its product in the United States, its actions fall short of the affirmative efforts to serve, directly or indirectly, the market for its product in the United States. . . .

. . . .

Even if one were to conclude that Meikikou did have material contacts with Minnesota under the stream-of-commerce theory, those contacts do not demonstrate that Meikikou purposefully availed itself of the protection of Minnesota law. The sale of the [product] to . . . Juelich's employer, arose from the unilateral actions of several intervening suppliers. . . . Meikikou had contractual relations only with [distributors] in Japan and were several steps removed from any sale or delivery in the U.S. [T]he mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.

*Id.* at 574–75 (final alteration in original) (quotations and citations omitted).

In 2011, the U.S. Supreme Court decided *J. McIntyre,* which reviewed a New Jersey Supreme Court decision. 131 S.Ct. at 2785. There, plaintiff was injured in New Jersey while using a metal-shearing machine manufactured by J. McIntyre, a corporation headquartered in England. *Id.* at 2786 (plurality opinion). The evidence showed that J. McIntyre made sales to U.S. customers through its sole distributor, based in Ohio, that J. McIntyre had no direct contacts with New Jersey, and that no more than four of J. McIntyre's machines ended up in New Jersey. *Id.* at 2786, 2796 (J. Ginsburg, dissenting).

The New Jersey Supreme Court held that New Jersey courts could exercise jurisdiction over J. McIntyre, concluding that jurisdiction is appropriate when a foreign manufacturer of a product "knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." *Nicastro v. McIntyre Machinery Am., Ltd.,* 201 N.J. 48, 987 A.2d 575, 591–93 (2010), *rev'd,* —— U.S. ——, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011). The New Jersey Supreme Court emphasized that "[t]he increasingly fast-paced globalization of the world economy has removed national borders as barriers to trade." *Id.* at 577.

Although a majority of the U.S. Supreme Court justices rejected this approach, a majority failed to agree on a proper rule relating to the stream-of-commerce theory. The plurality opinion, authored by Justice Kennedy and joined by Chief Justice Roberts and Justices Scalia and Thomas, acknowledged that under *World–Wide Volkswagen,* "a defendant's placing goods into the stream of commerce with the expectation that they will be purchased by consumers within the forum State may indicate purposeful availment." *J. McIntyre,* 131 S.Ct. at 2788 (plurality opinion) (quotation omitted). The plurality endorsed Justice O'Connor's approach in *Asahi* and stated that sometimes a defendant has purposefully availed itself of the forum by "sending its goods rather than its agents," but "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum." *Id.* The plurality explained that "as a general rule, it is not enough that the defendant might have predicted that its good will reach the forum," rejecting the rule that

"purposeful availment" could be based solely on the foreseeability that a defendant's goods would be sold in a particular state. *Id.* at 2788, 2790. Instead, courts must examine, on a case-by-case basis, whether the defendant targeted the forum by its conduct and the "economic realities of the market defendant seeks to serve." *Id.* at 2790.

The plurality determined that plaintiff had not established that J. McIntyre engaged in conduct purposefully directed at New Jersey:

> Recall that [plaintiff's] claim of jurisdiction centers on three facts: The distributor agreed to sell J. McIntyre's machines in the United States; J. McIntyre officials attended trade shows in several States but not in New Jersey; and up to four machines ended up in New Jersey. The British manufacturer had no office in New Jersey; it neither paid taxes nor owned property there; and it neither advertised in, nor sent any employees to, the State. Indeed, after discovery the trial court found that the "defendant does not have a single contact with New Jersey short of the machine in question ending up in this state." These facts may reveal an intent to serve the U.S. market, but they do not show that J. McIntyre purposefully availed itself of the New Jersey market.

*Id.* (citation omitted).

The concurring opinion, authored by Justice Breyer and joined by Justice Alito, concluded that "the outcome of this case is determined by our precedents," noting that the record left many unanswered questions. *Id.* at 2791, 2793 (Breyer, J., concurring in the judgment). The concurrence emphasized that it did not adopt either the plurality's or the New Jersey

Supreme Court's approach because this case did not present an occasion to consider "relevant contemporary commercial circumstances" that might be "relevant to ... change [the] present law." *Id.* at 2794.

In the concurring justices' view, the facts did not illustrate sufficient contacts between the foreign manufacturer and New Jersey to support the exercise of personal jurisdiction:

> [T]he relevant facts found by the New Jersey Supreme Court show no regular ... flow or regular course of sales in New Jersey; and there is no something more, such as special state-related design, advertising, advice, marketing, or anything else. [Plaintiff], who here bears the burden of proving jurisdiction, has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer purposefully avail[ed] itself of the privilege of conducting activities within New Jersey, or that it delivered its goods in the stream of commerce with the expectation that they will be purchased by New Jersey users.
>
> There may well have been other facts that [plaintiff] could have demonstrated in support of jurisdiction. And the dissent considers some of those facts. But the plaintiff bears the burden of establishing jurisdiction, and here I would take the facts precisely as the New Jersey Supreme Court stated them.

*Id.* at 2792 (second alteration in original) (quotations and citation omitted). The concurring justices concluded that "[n]one of our precedents finds that a single isolat-

ed sale, even if accompanied by the kind of sales effort indicated here, is sufficient." *Id.*

Justice Ginsburg, joined by Justices Sotomayor and Kagan, agreed with the New Jersey Supreme Court's approach. In dissenting, they concluded that New Jersey had personal jurisdiction over J. McIntyre because it had purposefully availed itself "of the United States market nationwide, not a market in a single State or a discrete collection of States," through sales by "its exclusive distributor." *Id.* at 2801 (J. Ginsburg, dissenting).

Although it resulted in three separate opinions, *J. McIntyre* reflects a number of principles. First, the stream-of-commerce theory is still a viable framework for analyzing whether a nonresident defendant may be subject to suit in a forum for tort claims relating to the use of its products by resident plaintiffs. A purposeful availment of the benefits and laws of a forum by a nonresident may be shown by the regular flow and course of sales of a nonresident defendant's products in the forum. Second, a majority of the justices once again rejected Justice O'Connor's approach to analyzing minimum contacts under the stream-of-commerce theory. Third, a forum may not exercise personal jurisdiction over a nonresident defendant without direct contacts with the forum when the evidence suggests that only one or a few isolated sales of defendant's product are made to the forum by a distributor. Fourth, mere foreseeability by the nonresident defendants that its products might end up in the forum is not enough to establish personal jurisdiction. And fifth, personal jurisdiction is only proper if maintaining the suit does not offend traditional notions of fairness and substantial justice. Put another way, even if sufficient indirect contacts exist and the defendant purposefully avails itself of the forum, litigating in the forum must be fair and reasonable to the parties involved.

With these principles and the precedential caselaw in mind, we conclude that the five-factor test as set forth in *Rostad* and *Juelich* still applies. We first analyze the first three factors under a stream-of-commerce theory, recognizing that contacts may be indirect. *See Juelich*, 682 N.W.2d at 571; *Rostad*, 372 N.W.2d at 721.

### 1. Quantity of contacts.

There is no dispute that SMI has no direct contacts with Minnesota. But SMI's claim that it lacks a sufficient quantity of indirect contacts with Minnesota is without merit.

Similar to facts in *Rostad* and *Stanek*, the evidence indicates a regular flow of sales of SMI's product to customers in Minnesota. SMI sold approximately $1.3 to 4 million in hoses annually to customers in the U.S. between 2000 and 2011, which accounted for approximately 21 to 32% of its total world-wide hose sales. During this same time period, SMI sold to Schieffer between $1 and 3.5 million worth of hose annually, which constituted about 87% of SMI's total U.S. sales over that ten-year period. In turn, Schieffer resold a substantial volume of SMI hoses to customers in its neighboring state of Minnesota. Schieffer submitted more than 50 invoices reflecting sales of SMI's hose to Hotsy, a Minnesota company. And Schieffer represented that between 2004 and 2007, it sold approximately 28,000 feet of SMI's hose to Hotsy.

SMI contends that these figures are merely numbers and that there is nothing

in the record for purposes of comparison. But there is no threshold sales figure required for determining substantial sales. In *Stanek*, we rejected a similar argument, noting that it was unknown which of LAQ's sales reached Minnesota but that LAQ made "extensive sales" to U.S. distributors. 474 N.W.2d at 834–35. And in *Rostad*, the supreme court only noted that On–Deck had "sold thousands of its bat weights" in Minnesota. 372 N.W.2d at 720.

 SMI compares itself to Meikikou in *Juelich*. The two companies share some characteristics—they are foreign manufacturers of component parts without direct contacts with Minnesota. But the similarities end there. In *Juelich*, only 17 out of 122 tables-systems incorporating Meikikou tables sold to customers in the United States found their way into Minnesota. 682 N.W.2d at 568. And Meikikou's tables made several stops before arriving in Minnesota. *Id.* Here, a substantial volume of SMI's product made its way into Minnesota. And SMI sold its product to Schieffer which is functionally SMI's main U.S. distributor. A foreign manufacturer of a component part cannot escape jurisdiction simply because it lacks a formal distribution agreement. *Cf. Russell v. SNFA*, 370 Ill.Dec. 12, 987 N.E.2d 778, 795 (Ill.2013) (finding jurisdiction over nonresident defendant in part because an entity was "[i]n essence" defendant's "marketer and distributor ... of their joint and ultimate product" and because defendant chose "to leave [the entity] the marketing and distribution to the consumer") (quotation omitted). Schieffer then sold a substantial volume of hoses to Minnesota customers, including Hotsy.

SMI hoses did not arrive in Minnesota fortuitously like defendants' products in *World–Wide Volkswagen*, *J. McIntyre*, and *Juelich*. Instead, through Schieffer, substantial amounts of SMI hoses were sold to customers in Minnesota. In sum, SMI sought to directly or indirectly serve the Minnesota market. This factor weighs in favor of exercising personal jurisdiction.

### 2. Quality of contacts.

 "In assessing the quality of contacts, this court looks to whether the party purposefully availed itself of the benefits and protections of Minnesota." *Juelich*, 682 N.W.2d at 574. Again, SMI compares itself to Meikikou in *Juelich* claiming that it does not affirmatively direct activity toward Minnesota. The record defies this contention.

Unlike Meikikou in *Juelich*, SMI, through Schieffer, had a regular course of voluminous sales of its product in Minnesota. Because SMI profited from such sales, SMI purposefully availed itself, albeit indirectly, of the benefits and laws of the state of Minnesota. *See J. McIntyre*, 131 S.Ct. at 2788 (plurality opinion); *Asahi*, 480 U.S. at 122, 107 S.Ct. at 1037 (Stevens, J. concurring in part and concurring in the judgment); *see also Rostad*, 372 N.W.2d at 722 ("In a commercial operation, sales are the most tangible contact with a jurisdiction.").

We also note that there is "quite a bit more" contact between SMI and Minnesota than just the flow of SMI products into the state: SMI marketed to the entire United States (including Minnesota), knew that its product would be sold to Minnesota customers, did not limit the territory in which its product could be sold, and encouraged sales of its products throughout the United States. *See Stanek*, 474 N.W.2d at 833–34. SMI shareholders and other personnel traveled from Israel to

visit Schieffer's facility on at least an annual basis in order to develop the U.S. market. And not only are SMI and Schieffer subsidiaries of the same German parent company, but they had common shareholders at the time of Butler's injury.

This is not a case where personal jurisdiction is based on the possibility that a nonresident defendant's products might fortuitously end up in Minnesota; rather, the substantial flow and course of sales to customers in Minnesota indicates that SMI targeted Minnesota and purposefully availed itself of the benefits and protections of this state. Additionally, SMI's awareness that Schieffer sold its products to Minnesota customers, SMI's relationship to Schieffer, and its marketing efforts further indicate purposeful availment. This factor weighs in favor of exercising personal jurisdiction.

### 3. The connection of the cause of action with these contacts.

The cause of action arose out of Butler's use of an allegedly defective pressure washer. According to Butler, the pressure washer's hose, manufactured by SMI, burst. SMI's connection with Minnesota is its sale of hydraulic hoses to Schieffer which, in turn, sold SMI hoses to Hotsy. Again, SMI compares itself to Meikikou in *Juelich*, arguing that the unilateral activity of another cannot connect it to Minnesota. But there is more than unilateral activity by Schieffer. SMI met with Schieffer to develop the U.S. market. Schieffer, in effect, was SMI's distributor to Minnesota, directing a high volume of hoses to this state. This factor weighs in favor of exercising personal jurisdiction.

### 4. The interest in Minnesota in providing a forum.

Minnesota has an interest in the litigation if the case involves a resident who was severely injured and the accident took place in Minnesota. *Rostad,* 372 N.W.2d at 722. But the interest is not a contact, cannot establish personal jurisdiction, and is a minor factor in the analysis. *Id.; Dent–Air v. Beech Mountain Air Service,* 332 N.W.2d 904, 908 (1983).

SMI claims that this factor weighs against exercising personal jurisdiction because there are other entities from which Butler could fully recover, relying on *Kohn v. La Manufacture Francaise Des Pneumatiques Michelin,* 476 N.W.2d 184, 188 (Minn.App.1991), *review denied* (Minn. Dec. 13, 1991). But unlike *Kohn,* this case has not been fully litigated. We reject SMI's argument because it is not apparent that Butler will be able to fully recover from one of the other defendants. *See Welsh v. Takekawa Iron Works, Co.,* 529 N.W.2d 471, 475 n. 2 (Minn.App.1995) (rejecting defendant's reliance on *Kohn* because "this case has not been fully litigated; it is not apparent here that full recovery will be available from" one of the other defendants). This factor, though minor, weighs in favor of exercising personal jurisdiction.

### 5. The convenience of the parties.

Convenience of the parties and witnesses is a neutral factor when some witnesses are required to travel regardless of the forum ultimately selected. *Juelich,* 682 N.W.2d at 575–76. Accordingly, this factor does not affect our analysis because some of the witnesses and parties will be required to travel to any forum.

In sum, we conclude that SMI has sufficient indirect contacts with Minnesota, evidenced by the high volume and regular course of sales of its product through Schieffer to Minnesota customers. We

also conclude that litigating the case in Minnesota is fair and reasonable. For these reasons, we affirm the district court's denial of SMI's motion for summary judgment.

## DECISION

Because SMI has sufficient minimum contacts with Minnesota, and because subjecting SMI to suit in Minnesota is not unfair or unreasonable, the district court did not err by denying SMI's motion for summary judgment.

**Affirmed.**